In re HEALTHCO INTERNATIONAL, INC., Debtor.

William A. BRANDT, Jr., Trustee, Plaintiff,

v.

HICKS, MUSE & CO., INCORPORATED, et al., Defendants.

Bankruptcy No. 93–41604–JFQ.

Adversary No. 95–4154.

United States Bankruptcy Court, D. Massachusetts.

Dec. 20, 1996.

See also 195 B.R. 971.

J. Joseph Bainton, Jose Baez, Ross & Hardies, New York City, Michael A. Khoury, Cohn & Kelakos, Boston, MA, for William A. Brandt, Trustee.

Carl Metzger, Testa, Hurwitz & Thibeault, Boston, MA, for Wand Partners, Mercury Asset Management, Life Partners Group.

David C. Fixler, Rubin & Rudman, Boston, MA, for Robert Casey, Helen Cyker.

Daniel J. Lyne, Hanify & King, Boston, MA, for Ray Doherty.

Mike McKool, Jr., Phillip N. Smith, Jr., Jeffrey A. Carter, McKool, Smith P.C., Dallas, TX, for The Hicks, Muse Group.

Steven M. Pesner, Akin, Gump, Strauss, Hauer & Feld, New York City, for The Apollo Group.

Christian M. Hoffman, Foley, Hoag & Eliot, Boston, MA, for Coopers & Lybrand.

Michael Jankowski, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C., Milwaukee, WI, for Valuation Research Corp.

Arthur Steinberg, Kaye, Scholer, Fierman Hays & Handler, New York City, for Kaye, Scholer, Fierman, Hays & Handler.

William J. Hanlon, Goldstein & Manello, P.C., Boston, MA, for Conseco.

John E. Tener, H. Bissell Carey III, Robinson & Cole, Boston, MA, Joseph L. Clasen, Robinson & Cole, Stamford, CT, for Chrysler Capital Corp.

Dennis E. Glazer, Davis, Polk & Wardwell, New York City, for J.P. Morgan.

Gary L. Weiner, Matthew Gluck, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Vincent A. Mai, Thomas L. Kempner.

Hugh J. Gorman III, Hinckley, Allen, Snyder & Comen, Boston, MA, for Joel Lewin.

Christopher Vrountas, Cooke, Clancy & Gruenthal, Boston, MA, for Marvin Cyker.

Thomas G. Rafferty, Cravath, Swaine & Moore, New York City, for Lazard Freres & Co.

Arnold P. Messing, Choate, Hall & Stuart, Boston, MA, Lazard Freres & Co.

Edwin G. Schallert, Debevoise & Plimpton, New York City, for Chancellor Trust Co., Chancellor Capital Management.

David A. Parke, Bulkley, Richardson & Gelinas, Springfield, MA, for Cramer, Rosenthal, McGlynn.

Mark N. Parry, Moses & Singer, New York City, for Gemini Partners, Arthur M. Goldberg.

Louis Goodman, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, for Skadden, Arps, Slate, Meagher & Flom.

Darragh Kasakoff, Robert Seder, Seder & Chandler, Worcester, MA, for Richards, Layton & Finger, Martineau Walker, Weil, Gotshal & Manges.

James F. Wallack, Goulston & Storrs, Boston, MA, for Morgan Stanley & Co.

Nancy Lazar, Davis, Polk & Wardwell, New York City, for J.P. Morgan & Co., Inc.

Mark D. Cress, Bulkley, Richardson & Gelinas, Springfield, MA, for Cramer, Rosenthal, McGlynn.

Kathleen Donius, Reinhart, Boerner, Van Deuren, Norris & Rieselback, Milwaukee, WI, for Valuation Research Corp.

Vincent Amoroso, Parker, Coulter, Daley & White, Boston, MA, for Robert Mulcahy III.

John Gilmore, Hill & Barlow, Boston, MA, for The Airlie Group.

## *DECISION ON MOTION BY GEMINI PARTNERS, L.P. AND ARTHUR M. GOLDBERG FOR PARTIAL SUMMARY JUDGMENT*

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Gemini Partners, L.P. ("Gemini") and Arthur M. Goldberg ("Goldberg") move for partial summary judgment dismissing as against them Counts 15 and 16 of the Third Amended Complaint brought by the Chapter 7 trustee, William A. Brandt, Jr. (the "Trustee"). Goldberg is a principal of Gemini. Counts 15 and 16 allege Goldberg and Gemini were controlling shareholders of Healthco International, Inc. (the "Debtor") who breached their fiduciary obligations owed the Debtor by proceeding with the May 1991 leveraged buyout of the Debtor (the "LBO"). Although the motion raises collateral issues concerning director self interest and the aiding and abetting of directors in breach of their fiduciary duties, I conclude Gemini was not a controlling shareholder.

I have previously described in some detail the circumstances of the LBO. *See Brandt v. Hicks, Muse & Co., Inc. (In re Healthco International, Inc.)*, 195 B.R. 971 (Bankr. D.Mass.1996). I here treat only those aspects relevant to the present motion.

### *FACTS*

The documents accompanying the motion and the Trustee's opposition disclose no genuine issue of material fact. Gemini is a limited partnership whose executive general partner is ERP Capital Corporation. Emanuel R. Pearlman ("Pearlman") is the director, president and sole stockholder of ERP Capital Corporation. Gemini has three other general partners: AMG Gemini Corp., EWS Gemini Corp. and D & NM Gemini Corp. These corporations are controlled, respectively, by Goldberg, Emil W. Solomine ("Solomine") and David M. Mandelbaum ("Mandelbaum").

In 1990, Gemini began acquiring shares of the Debtor's outstanding common stock. By May 3, 1990, it owned 9.96% of the shares. Soon thereafter, Gemini formed a committee, called the Committee for Maximizing Shareholder Value of Healthco International, Inc. (the "Committee"), whose members were Gemini, Pearlman, Goldberg, Solomine and Mandelbaum. The Committee solicited the Debtor's stockholders for their proxies and consents for the election of an entire new board of directors consisting of the Committee's nominees. Its nominees were Pearlman, Kenneth W. Aitchison, Bernard J. Hale, John Kenneth Looloian, Robert E. Mulcahy III, Mary Clark Webster and George A. Zurkow.

Gemini entered into a letter agreement with each of the nominees in which Gemini promised (i) if Gemini was successful in electing at least a majority of directors and the nominee was elected, to pay the nominee the difference between $24,000 and the aggregate director compensation the nominee receives during the nominee's first 18 months of service, (ii) if Gemini was successful in electing at least a majority of the board but the nominee was not elected, to pay the nominee $24,000, and (iii) if Gemini did not gain majority board representation but sold its shares of the Debtor at a profit, to pay each nominee $24,000 less any director compensation paid the nominee. According to a complaint filed by Gemini in the Court of Chancery of Delaware, the Committee succeeded in obtaining majority stockholder consent to the removal of the incumbent board and the election of the Committee's nominees.

On September 4, 1990, the Debtor executed a merger agreement (the "First Merger Agreement") with two entities controlled by the Dallas investment banking firm of Hicks, Muse & Co., Incorporated ("Hicks, Muse"). The entities were HMD Holding Corporation and its wholly owned subsidiary, HMD Acquisition Corporation. The merger agreement was part of a two-step process through which Hicks, Muse was to acquire the Debtor. HMD Acquisition Corporation would first make a tender offer to purchase all the Debtor's outstanding shares at $19.50 per share. Any shares not tendered were to be converted under the merger into cash at the same $19.50 per share price. Shares of the Debtor owned by HMD Acquisition Corporation were to remain shares of the Debtor. As a result of the merger agreement, the annual meeting of shareholders scheduled for September 6, 1990 was postponed to September 25, 1990.

On September 19, 1990, a "Settlement Agreement" was executed among Gemini, the Debtor, the Committee, the Committee's nominees, the Debtor's seven incumbent directors and seven individuals named in the Settlement Agreement to comprise the new board. In the Settlement Agreement, the parties agreed as follows:

(i) Three members of the incumbent seven-member board would resign.

(ii) Three of the Committee's nominees (Messrs. Aitchison, Looloian and Mulcahy) would take their place.

(iii) The new board as so reconstituted would hold a special meeting to nominate themselves as directors for reelection at the annual meeting.

(iv) Any future vacancy arising among the four preexisting directors would be filled by the remaining preexisting directors.

(v) Any future vacancy arising among the three new directors would be filled by the remaining Gemini nominees.

(vi) The new board would adopt a resolution (a) recognizing the existence of a Special Stockholder Committee (the "Special Committee"), consisting of Gerald C. Cramer ("Cramer") and others to be designated by Cramer, (b) authorizing a representative of the Special Committee to be present at all meetings of the board, (c) directing that the Special Committee's representative receive notice of all board meetings, (d) directing the Debtor's financial advisor to be available to consult with the Special Committee on the merger, and (e) directing the Debtor's financial advisor to inform the Special Committee and the new board members of the terms of any other takeover proposal.

(vii) If the pending merger is terminated in accordance with its terms or not consummated by February 28, 1991 (and by

vote of five of seven directors the Debtor does not seek an extension beyond that date), and within five business days thereafter the board does not agree to sell the Debtor to another party, the board would be increased to nine members and the additional two positions would be filled by individuals designated by the Special Committee.

(viii) The Debtor would reimburse Gemini for its out-of-pocket expenses incurred in the proxy contest, up to $2,200,000.

(ix) All litigation among the parties, which was considerable, would be terminated and mutual releases exchanged.

The parties complied with their obligations under the Settlement Agreement, and the new board took office.

Among the provisions of the First Merger Agreement was a condition that the Debtor's consolidated, audited 1990 financial statements show earnings before interest, taxes, depreciation and amortization ("EBITDA") of not less than $38 million. In February of 1991, the board received preliminary information from the Debtor's accountants indicating 1990 EBITDA would be only about $21.8 million. The Debtor informed Hicks, Muse of this. The parties then abandoned the First Merger Agreement. On March 1, 1991, Hicks, Muse proposed an acquisition of the Debtor at a revised price of $15 per share, to be effected through the same two-step process of tender offer and cash-out merger.

On March 26, 1991, by a vote of five to two, the board voted to recommend that stockholders tender their shares to HMD Acquisition Corporation at $15 per share and to approve a subsequent cash-out merger at the same price. By then, Mr. Looloian had resigned his directorship for health reasons and, through designation of the two remaining Gemini nominees, had been replaced by Goldberg. Those voting in favor of the tender and merger were Messrs. Goldberg, Mulcahy and Aitchison, plus two members of the preexisting board, Messrs. Mai and Kempner. Voting against the tender and merger were Messrs. Cyker (Marvin) and Lewin, both members of the preexisting board. The Debtor thereafter entered into another merger agreement with the same Hicks, Muse entities, this time at $15 per share (the "Second Merger Agreement").

The $15 tender offer was made. Thereafter, on or about May 22, 1991, shares not tendered were cashed out under the merger at $15 per share. The Trustee alleges this left the Debtor insolvent and with unreasonably small capital.

### Gemini As Controlling Shareholder

In Count 16, the Trustee alleges Gemini was a controlling shareholder, that as such it owed fiduciary duties to the Debtor and its creditors, that in permitting the Debtor to enter into the LBO Gemini knew or should have known the LBO would render the Debtor insolvent and leave it with unreasonably small capital, and that Gemini thereby breached its fiduciary duties, causing damage to the Debtor of at least $200 million.

■■■ Gemini owned only 9.96% of the Debtor's outstanding shares of common stock. Under the law of Delaware, the state of the Debtor's incorporation, a shareholder holding less than a 50% interest is not a controlling shareholder, with the fiduciary obligations accompanying that status, unless the shareholder exercises actual control over the conduct of the corporation. *E.g., Kahn v. Lynch Communication Sys., Inc.,* 638 A.2d 1110, 1114 (Del.1994); *In re Tri–Star Pictures, Inc., Litig.,* 634 A.2d 319, 328–29 (Del. 1993); *Gilbert v. The El Paso Company,* 490 A.2d 1050, 1055 (Del.Ch.1984) *aff'd,* 575 A.2d 1131 (Del.1990); *In re Shoe–Town Stockholders Litig.,* 1990 WL 13475, *6 (Del.Ch. Feb. 20, 1990); *In re Sea–Land Corp. Shareholders Litig.,* 1988 WL 49126, *3 (Del.Ch. May 13, 1988).

Under the Settlement Agreement, Gemini designated three of the seven members of the Debtor's board, naming Messrs. Aitchison, Looloian and Mulcahy. Obviously, these three individuals were satisfactory to Gemini. And Gemini could expect that three members of the Board would always be satisfactory to it, because of the provision in the Settlement Agreement specifying that a vacancy among those three would be filled by the remaining Gemini nominees. Its expectation was real-

ized when Looloian resigned for health reasons and Goldberg was named by Aitchison and Mulcahy to succeed him. But such an expectation as to only three members of a seven-member board does not give control over the board.

The Trustee contends Gemini obtained the requisite control through the provision in the Settlement Agreement giving the Special Committee the right to name an additional two directors if (i) by February 28, 1991 the pending merger was not consummated (and the board by a vote of five members had determined not to seek an extension), and (ii) within five days thereafter the board does not agree to sell the Debtor to another party. It seems obvious that Gemini bargained for this provision and suggested Cramer as chairman of the Special Committee, with authority to name the other members. The board thus had to either sell the company by the stipulated time or be reconstituted to nine, with five members being named by Gemini or parties designated by Gemini. This, the Trustee says, gave Gemini subtle but real influence over the entire seven-member board, an influence extending beyond Gemini's role in three of them joining the board. The preexisting directors (or at least two of them) had to agree to sell the company, under the pending merger or otherwise, or become a minority on a nine-person board whose majority would be composed of either Gemini nominees or designees of Gemini nominees.

Although perhaps giving Gemini some influence over the preexisting directors, this provision in the Settlement Agreement did not give Gemini a degree of influence amounting to the power to dictate the terms of a sale, so long as the board remained at seven. The terms of the merger then pending had already been fixed without Gemini's participation. Any other acquisition had to be approved by a majority of the board. Unless and until the nine member board came into existence, Gemini could name only three directors. It did not name the other four to the board and there are no other circumstances indicating influence on its part over them. As likely as not, they would disagree with the Gemini nominees on any future sale proposal. This is demonstrated by what actually occurred. Although the initial two Gemini nominees and Goldberg voted to approve the $15 per share transaction, two of the other four members opposed the transaction.

In sum, Gemini had the ability to name, and did name, only three of seven directors. This is not control. It seems likely that these three were not disinterested directors for the purpose of determining whether the board is entitled to the benefit of the business judgment rule. See, Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 362–65 (Del. 1993) (business judgment rule inapplicable if board is infected with self-interest). See also, Del.Code Ann. tit. 8 § 144 (1974) (transaction not voidable "solely" because of self-interest of some directors); Fliegler v. Lawrence, 361 A.2d 218, 222 (Del.1976) (section 144 does not sanction unfairness). There are a number of indicators that the Gemini nominees were not disinterested, not the least of which is Gemini's purpose of putting them on the board to sell its shares at a profit, as reflected in Gemini's compensation arrangement with them. And perhaps the provision in the Settlement Agreement triggering a nine-member board infected the other four board members with Gemini's self interest, aside from any self interest of their own resulting from individual stock ownership. But I need not decide these questions. Lack of disinterestedness on the part of even all seven board members does not equate to control by Gemini.

The Trustee attempts to show control on the part of Gemini through the conduct of Pearlman, owner of Gemini's managing general partner. At the request of Goldberg, Pearlman attended two board meetings in March of 1991. In private conversation, he told Goldberg and the two Gemini nominees that he favored the $15 transaction. That only goes to indicate Gemini's influence over Aitchison and Mulcahy.

Nor is the Trustee persuasive when he quotes from a statement in Pearlman's deposition referring to a discussion Pearlman had with the Debtor's president, Marvin Cyker. Pearlman said: "[w]e discussed that—how the company would be run if we decided not

to sell the company to Hicks, Muse." The most one could reasonably infer from this use of "we" is a reference to the four holdover directors and the three new directors. The same can be said of Pearlman's use of "our" in his account of his discussions with Robert E. Mulcahy III, a new board member designated by Gemini. Pearlman stated in his deposition: "I believe the discussions occurred after the $19 deal had been terminated by the company, and we had discussions about what are [sic] our potential alternatives."

This case is quite different from *In re Tri-Star Pictures, Inc., Litigation,* 634 A.2d 319 (Del.1993). The court there held that Coca Cola Company, which owned a 36.8% stock interest, was a controlling shareholder. But Coca Cola had voting agreements with other minority shareholders holding an aggregate 19.8% stock interest. The parties agreed they would collectively designate eight members of a ten-member board. Those agreements thus gave the minority stockholders joint control over the entire board. There was much evidence, moreover, of Coca Cola's influence over most members of the board. In the present case, Gemini's legal rights and practical influence are much less pervasive.

### Goldberg As Controlling Shareholder

■ Count 15 is brought against Goldberg and other directors or officers of the Debtor. It alleges Goldberg indirectly held Geminis' 9.96% stock interest and as a stockholder he exercised control over the Debtor "by virtue" of his position as a director, thereby owing the Debtor and its creditors fiduciary duties. This count thus seeks to establish Goldberg as a controlling stockholder through an amalgam of his directorship and an indirect ownership of Gemini's 9.96% stock interest.

Count 15 must fail in light if my ruling that Gemini is not a controlling shareholder. Goldberg did indeed have fiduciary obligations, but they arose from his position as a director, not as a controlling stockholder. In another count, Count 14, the Trustee alleges Goldberg and the other directors who voted in favor of the LBO breached their fiduciary obligations as directors. I have previously ruled that this count states a cause of action.

See *Brandt v. Hicks, Muse & Co., Inc. (In re Healthco International, Inc.),* 195 B.R. 971 (Bankr.D.Mass.1996).

### Cause Of Action Against Gemini For Aiding And Abetting Directors In Breach Of Their Fiduciary Duties

Although Gemini was not a controlling shareholder and hence owed the Debtor no fiduciary duties, this does not mean there is no cause of action against Gemini for aiding and abetting a breach of fiduciary duty by directors. The two causes of actions are distinct, as demonstrated by *Fry v. Trump,* 681 F.Supp. 252 (D.N.J.1988). In that case, Donald Trump had acquired 9.9% of the stock of Bally Manufacturing Company. Perceiving this as the beginning of a hostile takeover, Bally's board took various defensive measures, including the ingestion of "poison pills" in the form of adopting·a conditional stock rights plan at 50% of market value and signing a contract to purchase a casino at an inflated price. Following litigation, Bally bought Trump's stock for much more than the stock's traded price and obtained Trump's agreement not to purchase Bally stock for ten years. Trump made $31.7 million on the deal. In a shareholder suit brought against Trump, the court ruled the allegations of the complaint were insufficient to describe Trump as a controlling shareholder. The court also held, however, the complaint stated a cause of action against Trump for aiding and abetting Bally's directors in the breach of their fiduciary duties when they paid "greenmail" to him for the purpose of entrenching themselves in office.

There may or may not be a cause of action against Gemini for aiding and abetting the Debtor's directors in breach of their fiduciary duties. That question is not before me. I do note, however, that no such cause of action is alleged. In Count 13, the Trustee alleges Hicks, Muse and certain others, but not naming Gemini, knew that the directors who voted for the LBO were thereby breaching their fiduciary duties owed the Debtor, and these named defendants "aided and abetted the consummation of the LBO." Partly because Count 13 is also brought against the directors themselves, and partly because the

count appears immediately after fraudulent transfer counts, it is not entirely clear that Count 13 is intended to allege a cause of action for aiding and abetting directors in the breach of their fiduciary duties. In any event, Count 13 does not name Gemini. I will accordingly entertain a motion to amend the complaint so as to allege a cause of action against Gemini (and others) for aiding and abetting the Debtor's directors in the breach of their fiduciary duties.

A separate order has issued dismissing Counts 15 and 16 as against Gemini and Goldberg.